UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIMINAL NO. 11-78 (JNE/JSM)

      Plaintiff,

v.                                                        <u>REPORT AND RECOMMENDATION</u>

2)   RIGOBERTO BUSTO-MAGARAN,
6)   JOSE HERNANDEZ-BUSTOS, and
7)   LUIS A. MENDOZA-CABRERA,

      Defendants.

JANIE S. MAYERON, United States Magistrate Judge

The above matter came on for hearing before the undersigned upon defendant Luis A. Mendoza-Cabrera's Motion to Suppress Evidence as a Result of Electronic Surveillance [Docket No. 110], defendant Rigoberto Busto-Magaran's Pretrial Motion to Dismiss Count 1 [Docket No. 135], and defendant Jose Hernandez-Busto's Motion to Suppress Contents of Intercepted Wire and Oral Communications [Docket No. 193].

Assistant United States Attorney Thomas M. Hollenhorst appeared on behalf of the Government; Derk K. Schwieger appeared on behalf of Luis A. Mendoza-Cabrera, who was personally present; Thomas M. Kelly, Esq. appeared on behalf of Rigoberto Busto-Magaran, who was personally present; and Lee R. Johnson, Esq. appeared on behalf of Jose Hernandez-Bustos, who was personally present.  This matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

I.    **RIGOBERTO BUSTO-MAGARAN'S MOTION TO DISMISS COUNT 1**
      **(Docket No. 135)**

Defendant Rigoberto Busto-Magaran ("Busto-Magaran") argued that Count 1 of the Indictment [Docket No. 1] should be dismissed as defective on the grounds that the Government indicted multiple and separate conspiracies as one conspiracy resulting in a variance that violates his Fifth Amendment Right to Due Process. See Defendant's Memorandum in Support of Motion to Dismiss Count 1 [Docket No. 136], p. 1.   In particular, Busto-Magaran asserted that while Count 1 charges a single conspiracy involving eleven defendants, including Busto-Magaran, the multiple number of transactions alleged in the Indictment indicates multiple separate conspiracies involving different individuals at different times, thereby creating a variance. Id., p. 2.  According to Busto-Magaran, the Government has failed to identify any overt act or evidence demonstrating an overall agreement to achieve an overall objective, much less that he knew many of the co-defendants or was present when many of the alleged events occurred, Id.  In sum, Busto-Magaran moved to dismiss Count 1 of the Indictment on the basis that the Indictment is an improper attempt to define a group of separate transactions as a single conspiracy, and if the Count is not dismissed, he will be prejudiced by the introduction of spillover evidence relating to other alleged conspiracies. Id., p. 3.

The Government countered that the motion to dismiss lacks any basis because it will prove at trial that Busto-Magaran was the central member of the conspiracy. See Government's Consolidated Response to Defendants' Pretrial Motions [Docket No. 181], p. 3.   According to the Government, Busto-Magaran obtained methamphetamine from various members of the conspiracy and supplied it to other

2

members of the conspiracy.  Id.  In addition, the Government argued the motion to dismiss is a motion more properly argued before the district court judge after the Government presents its case-in-chief, as to require it to litigate the present motion would require the Government to try the case as part of the motions hearing.  Id.

Count 1 of the Indictment alleges that Busto-Magaran and ten other defendants:

> [D]id unlawfully, knowingly and intentionally conspire with each other and others, known and unknown to the grand jury, to distribute 50 grams or more of actual methamphetamine, a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846.

The remainder of the Indictment sets multiple counts against Busto-Magaran and various other defendants for the intentional distribution of methamphetamine on different dates.  See Indictment, Counts 2, 4, 5, 8, 9, 14 15, 19-22.

"'A variance results where a single conspiracy is charged but the evidence at trial shows multiple conspiracies.'"  United States v. Pizano, 421 F.3d 707, 720 (8th Cir. 2005) (quoting United States v. Morales, 113 F.3d 116, 119 (8th Cir.1997)) (emphasis added); see also Theus v. United States, 611 F.3d 441, 448 (8th Cir. 2010) ("A variance between the indictment and the proof results where a single conspiracy is charged but the evidence at trial proves multiple conspiracies.") (citing United States v. Morales, 113 F.3d 116, 119 (8th Cir.1997)).    While Busto-Magaran complained that the Government has failed to identify evidence that he knew many of co-defendants, the Eighth Circuit has held that in order to prove a single conspiracy, the Government need not show that all the conspirators were involved in each transaction, or even that all of the conspirators knew each other.  See United States v. Pullman, 187 F.3d 816, 821 (8th Cir. 1999).  Ultimately, the question of whether there are multiple conspiracies or a

single one is a question of fact that rests with the jury.  Id.  Further, the time to establish the elements of a conspiracy – for example, an agreement and overt acts – is not in the Indictment, but at trial.

However, the Court need not delve into the law of single versus multiple conspiracies to ascertain whether the Indictment in this case is defective.  "An indictment is sufficient if it: (1) contains the elements of the charged offense and fairly informs the defendant of the charge against which he must defend; and (2) enables him to plead double jeopardy as a bar to further prosecution."  United States v. Diaz-Diaz, 135 F.3d 572, 575-76 (8th Cir. 1998) (citing United States. v. Pemberton, 121 F.3d 1157, 1169 (8th Cir. 1997); United States v. Dolan, 120 F.3d 856, 864 (8th Cir. 1997); Fed. R. Crim. P. 7(c)(1)).  In this case, Count 1 of the Indictment fairly informs Busto-Magaran that he is charged with conspiracy to distribute 50 grams.  The fact that Busto-Magaran believes the alleged acts would have been more appropriately charged as multiple conspiracies does not mean Busto-Magaran has not been properly informed of the charges against him.  The Indictment is sufficiently clear, and Count 1 should not be dismissed as defective.

As for Busto-Magaran's concern that he will be prejudiced by the introduction of spillover evidence relating to other alleged conspiracies, lacking any evidence before this Court to permit it to make any judgment regarding prejudice, this issue is best raised before the district judge after the Government has presented its case-in-chief. Moreover, if the facts of this case, as developed at trial, lead the jury to conclude that there were multiple conspiracies, rather than a single conspiracy as charged, Busto-Magaran will have the right to appeal his conviction and argue that he was prejudiced by the variance between the Indictment and the proof.  See, e.g., Pullman, 187 F.3d at

820.  However, at this stage in the proceedings, the Court cannot find that the Indictment is defective.  As such, Busto-Magaran's motion to dismiss Count 1 of the Indictment should be dismissed without prejudice.

## II.  JOSE HERNANDEZ-BUSTOS' MOTION TO SUPPRESS EVIDENCE AS A RESULT OF ELECTRONIC SURVEILLANCE (Docket No. 193)

Defendant Jose Hernandez-Busto ("Hernandez-Busto") seeks an order suppressing the content of intercepted communications from the wiretap of Target Telephone #2, a phone allegedly used by "Luis LNU,"[1] because it failed to articulate the "requisite necessity and probable cause."  See Memorandum in Support of Motion to Suppress Contents of Intercepted Wire and Oral Communications, p. 2.  Hernandez-Busto submitted that the affidavit in support of the application for the wiretap failed the necessity requirement for a wiretap because it set out very little efforts to ascertain the identity of Luis LNU, "which in turn would have allowed law enforcement to use standard, conventional investigation techniques."  Id.  In addition, Hernandez-Busto asserted that the supporting affidavit lacked the requisite probable cause, as a pen register affixed to Target Telephone #2 only showed one call being made to the number allegedly used by the head of the conspiracy, Busto-Magaran, and only three calls made to any of the other members of the conspiracy, all of which were made to a person who was merely a drug courier.  Id.

In opposition, the Government argued that the affidavit in support of the wiretap application sufficiently set forth a description of the types of investigations that were

---

[1]    LNU stands for "last name unknown."  According to the Government, Luis LNU was ultimately identified as Hernandez-Busto.  Government's Memorandum in Response to Defendants' Motions to Suppress Evidence obtained as a Result of Electronic Surveillance [Docket No. 212] ("Gov't Elec. Surveillance Mem.") (citing Wiretap 552-68).

used or considered prior to the application for the wiretap, including physical surveillance, search warrants, pen register and toll records, confidential sources and sources of information, undercover investigations, use of grand jury subpoenas, and trash searches, and why these efforts had not furthered and could not further the objectives of the investigation. See Gov't Elec. Surveillance Mem., pp. 4-6. As to Hernandez-Bustos' assertion that the affidavit was deficient because it did not reveal the efforts made by law enforcement to identify Luis LNU, the Government contended that this argument lacked any merit, as the affidavit set forth that the investigation had not established his location or his identity, and the confidential source used only knew the suspect by his name and did not possess any information regarding his whereabouts. Id., p. 6. The Government also submitted that even if law enforcement had identified Luis LNU, it does not lead to the conclusion that the techniques used and considered, as set forth in the affidavit, would have proven to be any more effective. Id.

As for probable cause, the Government asserted that the affidavit contained sufficient evidence to support a finding of probable cause to believe that the target phone was being used by Luis LNU in drug trafficking, including the substance of numerous drug-related conversations with the CS1 and others over the phone, and the pen register information linking the phone with the phones of other suspected narcotics traffickers. Id., p. 7. In the alternative, the Government argued that the good faith exception under United States v. Leon, 468 U.S. 897, 923 (1984), applied. Id.

The parties submitted the affidavit in support of the wiretap for a "four-corners" analysis by the Court. See Government Ex. 3, pp. 600-626 ("Sass Affidavit").

A.   <u>Factual Background</u>

On April 29, 2010, Officer Kenneth Sass ("Officer Sass"), with the St. Paul Police Department, submitted an Affidavit of Application for the Interception of Wire Communications authorizing the interception of wire communications from a cellular telephone with a 612 area code—Target Telephone #2 ("TT-2")— subscribed by Juan Mata and used by "Luis LNU."  <u>See</u> Sass Affidavit, ¶ 5.  The Sass Affidavit claimed that there was probable cause to believe that Luis LNU was continuing to use TT-2 to commit narcotics-related offenses.  <u>Id.</u>  In addition, the Sass Affidavit stated that there was probable cause to believe that several individuals, including Luis LNU, were committing, and will continue to commit, violations involving the distribution of controlled substances.  <u>Id.</u>, ¶ 9.  The Sass Affidavit also alleged that there was probable cause to believe that communications from TT-2 will show how TT-2 was used to facilitate the possession and distribution of methamphetamine and cocaine, information reflecting the location or sources contraband, distribution centers and the identities of co-conspirators, the nature and scope of the conspiracy, the manner in which co-conspirators obtained and transported narcotics into Minnesota, and the disposition of drug proceeds.  <u>Id.</u>

The facts offered to support probable cause included the following: in January 2010, a confidential source ("CS1") identified a person known as Ramon, who was later identified as defendant Busto-Magaran, who served as CS1's source of cocaine and methamphetamine.  <u>Id.</u>, ¶ 11. The CS1 estimated that Busto-Magaran had sold him over 40 pounds of methamphetamine and 40 pounds of cocaine between 2008 and 2010.  <u>Id.</u>  The CS1 had also provided that Busto-Magaran was associated with a Hispanic male known to CS1 as Luis LNU.  <u>Id.</u>  According to CS1, Luis LNU was a source of cocaine.  <u>Id.</u>  CS1 owed Luis LNU $4,800 for nine ounces of cocaine, and

CS1 had previously purchased between 15 to 20 kilograms of cocaine, in 2009, from Luis LNU.  Id.

On March 9, 2010, Officer Sass met with CS1 in order to place a telephone call on a 651 area code number, which was a number used by Luis LNU, in an attempt to pay $1,000 towards the drug debt owed to Luis LNU.  Id., ¶ 13.  CS1 placed a call to Luis LNU in the presence of Officer Sass, however, the call went directly to voice mail and no contact was made with Luis LNU.  Id.  On the same date, CS1 placed a call, in the presence of Officer Sass, to Busto-Magaran in order to have Busto-Magaran contact Luis LNU on CS1's behalf.  Id., ¶ 14.  Busto-Magaran told CS1 that he would contact Luis LNU and have Luis LNU call CS1.  Id.  Soon thereafter, CS1 placed another call, in the presence of Officer Sass, to Busto-Magaran, during which Busto-Magaran told CS1 that he attempted to call Luis LNU, but he was unable to contact him.  Id., ¶ 15.  At 5:20 p.m., CS1 called Officer Sass and let him know that Luis LNU had called from a 612 area code number, TT-2, and that Luis LNU had told CS1 that TT-2 was his new number.  Id., ¶ 16.  While the call had not been recorded, Officer Sass reviewed the toll records for TT-2, which showed a single call to CS1 occurring in the afternoon of March 9, 2010.  Id.

On March 10, 2010, Officer Sass met with CS1 for the purposes of placing a recorded phone call to TT-2.  Id., ¶ 17.   The CS1 placed a recorded call to TT-2 in the presence of Officer Sass.  Id.  CSI spoke to Luis LNU, who stated that he would call the CS1 back in a few minutes.  Id.  At 2:10 p.m., CS1 received an incoming call from Luis LNU, using TT-2.  Luis LNU told CS1 that he wanted to send a female to "deliver the item," but was unsure if she would know the location of the restaurant where CS1 had suggested they meet.  Id., ¶ 18.  Officer Sass verified the incoming number to CS1's

phone by viewing CS1's phone log.  Id.  At 3:15 p.m., CS1 received an unrecorded phone call from Luis LNU using TT-2, during which Luis LNU told CS1 that the female courier was waiting at the Speedy Mart gas station located at Thomas and Dale in St. Paul, Minnesota and that the courier was driving a PT Cruiser.  Id., ¶ 19.  Officer Sass then searched CS1 and his vehicle and gave CS1 $1,000 in St. Paul Police funds to pay part of the drug debt owed to Luis LNU via a female courier.  Id., ¶ 20.

Police officers had set surveillance on the Speedy Mart gas station.  Id., ¶ 21. Officers observed both CS1 arrive at the gas station and a PT Cruiser parked with a Hispanic female occupant.  Id.  CS1, who was wearing a recording device, got into the PT Cruiser.  Id.  During the conversation, both CS1 and the female noticed a parked police squad car.  Id.  Officer Sass verified that a marked police squad car was present during the money transaction.  Id.  The CS1 stated that he was scared about the police officer and the female answered that "he" told her that the police officer was just running in to get something.  Id.  Officer Sass believed that the "he" the female was referencing was Luis LNU.  Id.  After the transaction had occurred, officers followed the PT Cruiser to a Minneapolis residence and determined that the PT cruiser was registered to Alma Buenrostro Chavez.  Id., ¶ 22.  At the debriefing of CS1 following the meeting with the female, CS1 indicated that he had given the money to her.  Id., ¶ 23.

At 3:33 p.m., CS1 placed a recorded telephone call to Luis LNU at TT-2 in the presence of Officer Sass.  Id., ¶ 24.  During the call, CS1 asked Luis LNU if he could "do a colita," a slang term used by CS1 and Luis LNU for nine ounces of cocaine.  Id. CS1 had represented that he would pay for half of it up front and then pay later for the other half.  Id.  Luis LNU told CS1 that he would have to call "the guy to see if they re-upped" because they had no supply.  Id.  CS1 believed that Luis LNU was in the state of

Washington, which is where he typically travelled to obtain cocaine.  Id.  Pen register data showed that Luis LNU was in Washington when this conversation took place.  Id., ¶ 25.

On March 17, 2010, agents met with CS1 to make a call to Luis LNU on TT-2. The CS1 placed a recorded call to TT-2, which was verified by Officer Sass using CS1's call logs, and asked Luis LNU what he thought about CS1's purchasing nine ounces of cocaine.  Id., ¶ 26.  Luis LNU represented that his guy had not "re-up'd."  Id.  CS1 and Luis LNU agreed to talk in the future.  Id.

On April 18, 2010, officers were monitoring Target Telephone #1 ("TT-1") used by Busto-Magaran, pursuant to a court wiretap order, when TT-1 received an incoming call from TT-2.  Id., ¶ 27.  During the intercepted call, Luis LNU asked Busto-Magaran "Do you guys have any work?" ("work" being a term Officer Sass believed meant methamphetamine); Busto-Magaran said "yea."  Id.  Luis LNU stated they were going to give some to a "guy" that day and they should talk to him to make arrangements.  Id. Officer Sass believed that Luis LNU was asking Busto-Magaran if he had any methamphetamine and then they discussed a methamphetamine deal related to an unknown third party.  Id.  According to Officer Sass, the voice on TT-2 was the same voice as those from previously recorded calls involving Luis LNU.  Id.

On March 15, 2010, United States Magistrate Judge Jeanne J. Graham signed an order authorizing the installation of a pen register and trap trace device on TT-2.  Id., ¶ 28.  The pen register revealed that TT-2 had 27 contacts with a telephone number belonging to Roselia R. Vela, between March 24, 2010 and April 26, 2010.  The investigation of Vela showed that on April 6, 2009, Vela gave a DEA informant a small sample of cocaine in Washington.  Id., ¶ 29(a).  A confidential reliable informant

provided that Vela was a low-level cocaine and methamphetamine dealer with ties to higher level Mexican drug traffickers operating in the Washington area.  Id.

The results of the March 15, 2010 pen register also indicated that between April 8, 2010, and April 16, 2010, TT-2 and another phone (TT-3) had three contacts with a phone number known to be used by Miguel Soto-Chaves ("Soto-Chaves"), a drug courier working for the Busto-Magaran drug trafficking organization.  Id., ¶ 29(b).  During several interceptions of TT-1, Busto-Magaran was heard speaking to "Chino" who agreed to buy "a half" and pay Busto-Magaran the sum of $6400; during a later call, Busto-Magaran told "Chino" that his courier's cell number was the phone number used by Soto-Chaves.  Id.

Between April 11, 2010 and April 26, 2010, TT-2 had two contacts with a phone number that agents knew was used by a Christian Omar Sanchez Ortiz.  Id., ¶ 29(c). A Dakota County Task Force provided information that in February of 2010, a confidential reliable informant made a controlled purchase of methamphetamine from Ortiz.  Id.

According to Officer Sass, the interception of wire communications over TT-1 and TT-2 was necessary to obtain direct evidence that will convince a jury beyond a reasonable doubt of: (1) the scope, extent and personnel involved in the narcotics trafficking conspiracy; (2) the identity of all suppliers to the known conspirators and their identified and unidentified co-conspirators; (3) the identity of the main customers of the known and unknown narcotics traffickers; (4) the management and disposition of proceeds generated by this organization; and (5) the identity other persons involved in this organization.  Id., ¶ 30.

The Sass Affidavit also listed the conventional methods often employed to obtain this information (e.g. physical surveillance, record checks, informant interviews, pen registers, analysis of toll records, drug seizures), indicated that they had not provided information sufficiently specific as to the conduct, participation and scope of the conspiracy, and why a wiretap was necessary. Id., ¶ 31. Officer Sass noted that officers did not have the opportunity to conduct physical surveillance of Luis LNU, except for the money transaction that occurred between CS1 and the Hispanic female on March 10, 2010, and that surveillance had to be terminated before the identity of the courier or the residence could be obtained. Id., ¶ 32. Officer Sass further stated that based on his training and experience, surveillance, in of itself, rarely was successful in gathering conclusive evidence of criminal activities and usually was used to confirm meetings between co-conspirators or to identify people and locations. Id., ¶ 33. According to Officer Sass, surveillance does not provide details of the exact purpose or contact of a meeting, except by inference, and places officers at a disadvantage in knowing where to initiate surveillance because many of the individuals that contact TT-2 are unknown by law enforcement. Id.

Officer Sass opined that the execution of search warrants was not feasible, as the residence of the user of TT-2 had not been identified. Id., ¶ 34. Even if search warrants were executed at the residence of Luis LNU or unidentified co-conspirators, Officer Sass warned that these searches would alert the subjects to the scope of the investigation and jeopardize the investigation. Id. Officer Sass also stated that a seizure using a search warrant would not reveal the entire quantum of narcotics involved in the investigation, and noted that large-scale drug traffickers often utilize several locations to conceal controlled substances and proceeds to minimize the risk of

discovery during the execution of a search warrant, and that execution of one search warrant in one location often can result in the removal of contraband from other locations. Id. In addition, Deputy Officer Sass stated that based on his experience, there is a finite period between the delivery of drugs and the subsequent distribution and the gathering of proceeds. Id. As such, the execution of a search warrant without knowledge of when a co-conspirator would be in possession of contraband or proceeds created a random chance of discovering all the pertinent evidence. Id.

Officer Sass noted that pen registers and toll records had been valuable tools in the investigation. Id., ¶ 35. However, these tools only confirmed a contact between two telephones and not the substance of a conversation. Id., ¶¶ 35-36. The content of communications was especially significant where Louis LNU and others routinely discarded or switched cellular telephones in an effort to avoid law enforcement detection. Id. This belief was supported by the fact that the subscriber records of several of the telephone numbers identified in the investigation were pre-paid cellular accounts with no additional information. Id.

Officer Sass acknowledged that CS1 had provided useful information in the present investigation. Id., ¶ 37. However, Officer Sass indicated that CS1 had not been able to infiltrate the drug trafficking organization and agents did not believe CS1 had the ability to infiltrate Luis LNU trafficking organization or the extent of the organization. Id.

Officer Sass stated there was no avenue available for an undercover agent to infiltrate the organization safely and there was no known avenue whereby an undercover officer could believably be introduced to the user of TT-2, Luis LNU or his con-conspirators. Id., ¶ 38. At best, the undercover agent would be in a position similar

to that confidential informant and would not be able to provide information of the command and control structure of the distribution organization. Id.

According to Officer Sass, the use of a grand jury subpoenas would only serve to obtain information from sources that have already provided information, and actual targets of the investigation would likely invoke their Fifth Amendment privilege against self-incrimination. Id., ¶ 39. Granting immunity to the targets would result in a lack of prosecution of some of the most culpable individuals. In addition, the issuance of subpoenas to lower level members of an organization could alert other members of the organization as to the scope and progress of the investigation. Id.

Officer Sass indicated that trash searches were impractical because Luis LNU was not known by law enforcement. Id., ¶ 40. Even if officers knew his address, Officer Sass believed that a garbage pull would not reveal the details of the drug trafficking organization, including the identity of its members and sources of supply of cocaine and methamphetamine. Id.

Given that normal methods of investigation had limited success, appeared unlikely to succeed if tried or continued, or were too dangerous, Officer Sass believed that electronic surveillance appeared to be the only investigative tool that was likely to expose the scope and extent of the drug trafficking organization. Id., ¶¶ 41-42. On this basis, Officer Sass requested an authorization for a 30-day interception of wire communication over TT-2. Id., ¶42.

Officer Sass represented that all interceptions of communication would be minimized pursuant to the minimization requirements of Chapter 119 of Title 18, United States Code. Id., ¶ 45.

On May 27, 2010 United States Chief District Judge Michael J. Davis issued an order authorizing the interception of wire communications from TT-2 for a period of 30 days.

**B.** **Analysis**

**1.** **Necessity**

Hernandez-Busto argued that in seeking court authorization for the wiretap, the Government failed to satisfy the prerequisite of necessity as required by 18 U.S.C. § 2518.

Section 2518 governs the application for and issuance of wiretaps. The relevant provisions state:

> (1) Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
>
> > (a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;
> >
> > (b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;
> >
> > (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

****

(3) Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction), if the judge determines on the basis of the facts submitted by the applicant that--

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

***

18 U.S.C. § 2518(1), (3).

The necessity requirement of § 2518 insures "'that wiretaps are not routinely employed as the initial step in an investigation.'" United States v. Jackson, 345 F.3d 638, 644 (8th Cir. 2003) (quoting United States v. Thompson, 210 F.3d 855, 858-859 (8th Cir.), cert. denied, 532 U.S. 996 (2000), quoting, in turn, United States v. Maxwell, 25 F.3d 1389, 1394 (8th Cir.), cert. denied, 513 U.S. 1031 (1994)). "To satisfy the requirement, an application requesting a wiretap order must include 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" Jackson, 345 F.3d at 644 (quoting 18 U.S.C. § 2518(1)(c)). However, the necessity requirement does not "require that law enforcement officers 'exhaust all possible techniques before applying for a wiretap.'" Thompson, 210 F.3d at 859

16

(quoting United States v. Shaw, 94 F.3d 438, 441 (8th Cir.), cert. denied, 519 U.S. 1100 (1997)) (citation omitted).

Here, the wiretap was not utilized as the initial step in the investigation of Hernandez-Busto or the drug-trafficking organization of which he was allegedly a member. Officer Sass explained what investigative techniques had been used to locate and learn the identity of Luis LNU, the location and identity of other members of the organization, and the scope of the organization's activities, and the limited information officers had obtained from these tools. For example, officers had used CS1 to make contact with the user of TT-2 to pay back a drug debt. CS1 was told by Luis LNU that his new number was TT-2. While CS1 made contact with Luis LNU via TT-2 and arranged for a payment, the delivery, which was under police surveillance, was made to a female and did not lead to finding Luis LNU. Officers also had the CS1 place recorded telephone calls to Luis LNU at TT-2, during which drug transactions were discussed. Officers utilized an authorized wiretap of Busto-Magaran's cellular telephone to record a conversation between him and the user of TT-2 involving methamphetamine. Further, officers used a pen register to see if there were any connections between TT-2 and other numbers associated with narcotic activities. All of this information could only pinpoint that Luis LNU was somewhere in the State of Washington, and did not result in learning the location and identity of other members of the drug trafficking organization or the scope of the organization's activities. In addition, the affidavit set forth the reasons for not using search warrants, surveillance, further pen registers, confidential sources of information, undercover officers, trash searches and grand jury subpoenas.

The Court concludes that officers had exhausted their attempts to use normal traditional investigative techniques to identify and locate Luis LNU, the other members of the drug trafficking organization, and the scope and extent of its activities.   In addition, the Court concludes the Sass Affidavit sufficiently sets forth why additional traditional techniques would not be effective to identify and locate Luis LNU or provide additional information as to the organization and source of narcotics for the operation under investigation.  As such, the Court finds that the Government has met its statutory duty with respect to a statement of necessity.

### 2.      Probable Cause

Courts are to "evaluate probable cause for the issuance of a wiretap under the same standard that we use to evaluate probable cause for the issuance of a search warrant."  United States v. Fairchild, 189 F.3d 769, 775 (8th Cir. 1999) (citing United States v. Garcia, 785 F.2d 214, 221-22 (8th Cir.), cert. denied, 475 U.S. 1143 (1986)). Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place."  United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).  The task of an issuing court is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit … including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Gates, 462 U.S. at 238.  In reviewing this decision of the issuing court, the duty of the reviewing court is simply to ensure that the court had a substantial basis for concluding that probable cause existed.  Id. at 238-39 (citation omitted); see also United States v. LaMorie, 100 F.3d 547, 552 (8th Cir. 1996) (citation omitted) ("Our duty as the

18

reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed, and we owe substantial deference to the determination of probable cause by the issuing judge.").

Hernandez-Busto's contention that the Sass Affidavit is not supported by probable cause, ignores the fact that the Affidavit provides evidence to believe that Luis LNU is using TT-2 to commit narcotics-related offenses, including the distribution of narcotics. In this case, the Sass Affidavit has succinctly tied Luis LNU to narcotics activity and the use of cellular telephones in the furtherance of narcotics activity. The Sass Affidavit contained information from CS1 that Luis LNU was affiliated with defendant Busto-Magaran in narcotics activity. Indeed, it was Busto-Magaran who was able to connect Luis LNU to the CS1 in order to pay back a drug debt. The Sass Affidavit also provided that Luis LNU told CS1 that TT-2 was his number and Luis LNU used TT-2 to arrange a payment of the drug debt, which was later confirmed by the surveillance of officers when CS1 delivered the money to a female sent to meet CS1 by Luis LNU. In addition, the Sass Affidavit contained information that officers had CS1 place recorded telephone calls to Luis LNU at TT-2, during which drug transactions were discussed. Officers also utilized an authorized wiretap of Busto-Magaran's cellular telephone to record a conversation between him and the user of TT-2 involving methamphetamine. Based on all of these facts, the Court concludes that there was sufficient basis for the issuing judge to conclude that there was probable cause to believe that Luis LNU was using TT-2 in the furtherance of narcotics crimes.[2]

---

[2] This Court will not discuss the <u>Leon</u> exception since it has determined that sufficient probable cause existed for the issuance of the wiretap.

For all of the reasons stated above, Hernandez-Busto's motion to suppress evidence as the result of electronic surveillance should be denied.

## III.    LUIS A. MENDOZA-CABRERA'S MOTION TO SUPPRESS EVIDENCE AS A RESULT OF ELECTRONIC SURVEILLANCE (Docket No. 110)

Defendant Luis A. Mendoza-Cabrera ("Mendoza-Cabrera") seeks the suppression of communications intercepted from a telephone used by him, pursuant to an authorized wiretap based on a Title III application found on pages 627 to 693 in Government Exhibit 3.   In support, Mendoza-Cabrera argued that the affidavit accompanying the application did not show the requisite exhaustion of normal investigative procedures, or that they would reasonably have failed if tried, and only made vague assertions regarding the inability to use undercover investigations, surveillance, search warrants or grand jury subpoenas to further the investigation.   See Defendant's Memorandum in Support of Motions to Suppress Evidence as a Result of Electronic Surveillance [Docket No. 211], p. 2.   Relying on its opposition to Busto-Magaran's motion to suppress electronic evidence, the Government maintained that the supporting affidavit provided a thorough description of the investigative techniques that had already been used and considered, and why and how these techniques would not have furthered the objectives of the investigation.   See Gov't Elec. Surveillance Mem., p. 8

The parties submitted the affidavit in support of the wiretap for a "four-corners" analysis by the Court.   See Government Ex. 3, pp. 651-693 ("Fry Affidavit").

### A.    Factual Background

On May 4, 2010, David W. Fry ("Deputy Fry"), a Deputy with the Sherburne County Sheriff's Department, submitted an Affidavit of Application for the Interception of

Wire Communications authorizing the interception of wire communications from a cellular telephone with a 651 area code—Target Telephone #2 ("TT-2 (651)")—subscribed by Mike Luck Mata and used by Andres Vazquez Avila ("Avila"). See Fry Affidavit, ¶ 4. The Fry Affidavit claimed that there was probable cause to believe that Avila, a/k/a Manuel Contrera, was continuing to use TT-2 (651) to commit narcotics related offenses. Id., ¶ 8. Persons that were expected to be intercepted included Avila, defendant Mendoza-Cabrera (an alleged drug courier for Avila), one of Avila's customers and defendant Busto-Magaran. Id., ¶ 9.

The facts offered to support probable cause included the following: since February 2010, a confidential source ("CS#1") had been assisting officers in a multi-pound drug trafficking investigation. Id., ¶ 10. CS#1 identified a person known as "Manuel (later identified as defendant Avila), who was a multi-pound source of methamphetamine in St. Paul. Id. CS#1 provided officers with Avila's cellular telephone number. Id. CS#1 had never purchased methamphetamine from Avila, but received the information from a source of information ("SOI#1") who law enforcement had identified as an associate of Avila. Id.

On February 19, 2010, under the surveillance of officers, CS#1 was introduced to Avila with the assistance of SOI#1. Id., ¶ 10(a). CS#1 was equipped with an electronic recording device and was provided with $700 of Ramsey County buy money. Id. Avila met with CS#1 in the parking lot of an apartment building. Id. CS#1 purchased a half ounce of methamphetamine from Avila in exchange for $700. Id. Avila gave CS#1 a new telephone number to contact him for future drug transactions. Id. After the transaction, officers made contact with CS#1 and recovered a substance that later tested positive for the presence of methamphetamine. Id.

21

On March 10, 2010, CS#1 placed a call to Avila under the observation of police officers. Id., ¶ 10(b). Officers observed CS#1 call the number given to him by Avila. Id. During the conversation, Avila agreed to meet soon with CS#1 to sell some methamphetamine to CS#1. Id. CS#1 called Avila for a second time on the same date and ordered one ounce of methamphetamine for $1,400. Id., ¶ 10(c). Avilla agreed to sell the methamphetamine and told CS#1 to meet him at the Sears Parking lot in 30 minutes. Id. Under the direction of officers, CS#1 met with Avila's courier to purchase methamphetamine. Id., ¶ 10(d). CS#1 was equipped with an electronic recording device and was provided with $1,400 of buy money. Id. CS#1 met with the courier, who identified himself as Luis (later identified as Luis Mendoza-Cabrera). Id. Mendoza-Cabrera told CS#1 that Avila had sent him and provided CS#1 with a half-ounce of methamphetamine in exchange for $700. Id. Mendoza-Cabrera gave CS#1 a cell phone number with a 763 area code and told CS#1 to contact him if CS#1 needed additional methamphetamine. After the transaction, officers made contact with CS#1 and recovered a substance that later tested positive for the presence of methamphetamine. Id.

On March 17, 2010, Avila called CS#1 and gave him a new telephone number ("TT-1") in order to contact him for any future drug purchases. Id., ¶ 10(e). On March 18, 2010, CS#1 placed a recorded call to Avila's new cell phone number (TT-1) under officer supervision. Id., ¶ 10(f). CS#1 placed an order with Avila for one ounce of methamphetamine for $1,400 and Avila told CS#1 that he would send his runner because he was busy. Id. Under the direction of officers, CS#1 met with Avila to purchase methamphetamine. Id., ¶ 10(g). CS#1 was equipped with an electronic recording device and provided with $1,400 of Ramsey County buy money. Id. CS#1

met with the Avila.  Id.  Avila provided CS#1 with a one ounce of methamphetamine in exchange for $1,400.  Id.  After the transaction, officers made contact with CS#1 and recovered a substance that later tested positive for the presence of methamphetamine. Id.

On March 18, 2010, United States Magistrate Judge Jeanne J. Graham signed an order authorizing the installation of a pen register and trap trace device on TT-1.  Id., ¶ 10(h).  The pen register revealed that TT-1 had contacts with over 100 different telephone numbers between March 7, 2010 and April 25, 2010 and maintained a high call volume with 20 different telephone numbers.  Id.  On April 19, 2010, officers noticed a distinct decline in the use of TT-1, which included the stoppage of calls coming from many suspected customers.  Id., ¶ 10(i).  Surveillance on April 22, 2010, revealed that Avila was talking on a cell phone on multiple occasions.  Id., ¶ 10(j).  The pen register on TT-1 showed that Avila was not using this cellular phone during the surveillance.  Id. On April 23, 2010, agents received the tolls from the top callers of TT-1, which showed that these callers also had a high volume of contacts with TT-2 (651).  Id., ¶ 10(k).

On April 16, 2010, Chief Judge Davis signed an order authorizing the wiretap of a telephone used by defendant Busto-Magaran, a known methamphetamine dealer in St. Paul and suspected drug associate of Avila.  Id., ¶ 10(l).  On April 23, 2010, officers intercepted an incoming call from TT-2 (651) to Busto-Magaran.  The opinion of the translators of the intercepted telephone call was that the voice of the user of TT-2 was that of Avila.  Id.  During the intercepted call, Busto-Magaran asked Avila where he was, and Avila replied that he was "working."  Id.  Based on interviews with confidential sources and the interception of other wire communications, officers believed that "working" meant that Avila was dealing narcotics, as officers did not believe that Avila

23

had a credible place of employment based on surveillance conducted and information provided from SOI#1. Id.

On April 26, 2010, United States District Court Judge Ann D. Montgomery signed an order authorizing a wiretap of TT-1, however, officers discovered that TT-1 had no available minutes for usage. Id., ¶ 10(m).

On April 28, 2010, Avila contacted CS#1 from TT-2 (651) and told CS#1 that TT-2 was his new number and to contact him on TT-2 for future drug transactions. Id., ¶ 10(n). A pen register for TT-2 showed that TT-2 had placed an outgoing call to CS#1's cellular telephone on April 28, 2010. Id.

Based on officers' observations, Avila had used and disposed of four different cellular telephones from February 2010 to April 2010. Id., ¶ 10(o).

Officers believed that Avila was using TT-2 (651) in furtherance of his drug trafficking activities at that time. Id.

On April 27, 2010, United States Magistrate Judge Jeffery J. Keyes signed an order authorizing the installation of a pen register and trap trace device on TT-2 (651) Id., ¶ 11. Contacts with TT-2 (651) included 46 contacts with the cell phone number of Johnny Scott, who pled guilty in 1992 to a charges of felon possession of drugs. Id., ¶ 14. TT-2 (651) also had 35 contacts with a number belonging to Laura Aida Ovall-Guadarrama at an address that was suspected by officers as being a drug stash house location used by Avila, and was the location where Avila had sold narcotics to CS#1. Id., ¶ 15. The pen register also showed that on April 23, 2010, TT-2 (651) had three contacts with a phone that was being used by defendant Busto-Magaran. Id., ¶ 16. TT-2 (651) also had two contacts with another phone that was being used by Busto-Magaran. Id., ¶ 17.

According to Deputy Fry, the interception of wire communications over TT-1 and TT-2 (651) was necessary to obtain direct evidence that would convince a jury beyond a reasonable doubt of: (1) the scope, extent and personnel involved in the narcotics trafficking conspiracy; (2) the identity of all suppliers to the known conspirators and their identified and unidentified co-conspirators; (3) the identity of the main customers of the known and unknown narcotics traffickers; (4) the management and disposition of proceeds generated by this organization; and (5) the identity other persons involved in this organization. Id., ¶ 18.

The Fry Affidavit also listed the methods that had been employed to obtain this information and why a wiretap was necessary. Deputy Fry noted that on February 25, March 5 and 8, 2010, officers conducted surveillance of Avila in a vehicle and observed him accelerating for no reason, make multiple turns with no signal, and then stop without getting out the vehicle. Id., ¶ 20. Based on his training and experience, Deputy Fry knew that this conduct was consistent with drug dealers checking for the presence of law enforcement. Id., ¶ 21. Deputy Fry also stated that through his training and experience, surveillance, in of itself, rarely is successful in gathering conclusive evidence of criminal activities and rather, is used to confirm meetings between co-conspirators or to identify people and locations. Id. According to Deputy Fry, surveillance does not provide details of the exact purpose or content of a meeting, except by inference, and places officers at a disadvantage in knowing where to initiate surveillance because many of the individuals contacted by TT-2 (651) are unknown by law enforcement. Id.

Deputy Fry also explained that the execution of search warrants at any location was not feasible at this time because the warrants would alert the subjects to the scope

of the investigation, which would then jeopardize the investigation and interfere with law enforcement learning the identity and location of all the co-conspirators, including drug sources and couriers.  Id., ¶ 22.  Deputy Fry also provided that a seizure using a search warrant would not reveal the entire quantity of narcotics involved in the investigation and noted that large-scale drug traffickers often utilize several locations to conceal controlled substances and proceeds in order to minimize the risk of discovery during the execution of a search warrant.  Id.  Further, execution of one search warrant often causes the removal of contraband at other locations, thus allowing many culpable persons to avoid detection and prosecution.  Id.  In addition, Deputy Fry stated that based on his experience there is a finite period between the delivery of drugs, the subsequent distribution and the gathering of proceeds.  Id.  As such, the execution of a search warrant without knowledge of when a co-conspirator would be in possession of contraband or proceeds would create only a random chance of discovering all of the pertinent evidence.  Id.

Deputy Fry noted that pen registers and toll records had been valuable tools in the investigation.  Id., ¶ 23.  However, these tools can only confirm a contact between two telephones and not the substance of conversations.  Id. ¶ 23-24.  Deputy Fry stated that the content of communications was especially significant where Avila changed his cellular telephone every couple of months, Avila and others had routinely discarded cellular telephones in an effort to avoid law enforcement detection, and the subscriber records of several of the telephone numbers identified in the investigation showed that they were pre-paid cellular accounts with no additional information.  Id.

Deputy Fry acknowledged that CS#1 had provided useful information in the present investigation, including information that could result in Avila's arrest and

prosecution, however, agents did not believe that CS#1 had the ability to fully infiltrate Avila's drug trafficking organization.  Id., ¶ 25.  CS#1's information to date had not exposed Avila's source or supply or his distribution network.  Id.  As for SOI#1, who had been identified as an associate of Avila, Deputy Fry indicated that this individual was not willing to cooperate with law enforcement and was not aware of the investigation.  Id.

Deputy Fry stated that there was no avenue available to infiltrate the organization safely and there was no known means whereby an undercover officer could believably be introduced to the user of TT-2 (651) or his co-conspirators.  Id., ¶ 26.  At best, the undercover agent would be in a position similar to that of a confidential informant and would not be able to meet the goals of the investigation of identifying and prosecuting the command and control structure of the distribution organization, which was based in and outside of Minnesota.  Id.

As for the use of a grand jury subpoena, Deputy Fry indicated that it would only serve to obtain information from sources who had already provided information, and the actual targets of the investigation would likely invoke their Fifth Amendment privilege against self-incrimination.  Id., ¶ 27.  Granting immunity to the targets would result in a lack of prosecution of some of the most culpable individuals.  Id.  In addition, Deputy Fry believed that the issuance of subpoenas to lower level members of an organization would likely alert other co-conspirators as to the scope and progress of the investigation.  Id.

According to Deputy Fry, trash searches were impractical because Avila's residence was an apartment complex in which all of the tenants of the complex shared a common garbage container.  Id., ¶ 28.  Even if Aliva's garbage could be searched,

Deputy Fry believed that a garbage pull would not reveal the full details of the drug trafficking organization.  Id.

Given that normal methods of investigation appeared unlikely to succeed if tried or continued, Deputy Fry requested an authorization for a 30-day interception of wire communications over TT-2.   Id., ¶¶ 29-31.

Deputy Fry represented that all interceptions of communications would be minimized pursuant to the minimization requirements of Chapter 119 of Title 18, United States Code.  Id., ¶ 33.

On May 4, 2010, Judge Montgomery issued an order authorizing the interception of wire communications from TT-2 (651) for a period of 30 days.

B.   **Analysis**

Mendoza-Cabrera's urged the suppression of the wiretaps of TT-2 (651) because the Fry Affidavit only made vague and boilerplate assertions regarding the inability of officers to conduct normal investigative techniques such as undercover investigations, surveillance, search warrants or grand jury subpoenas to further the investigation.  The Court finds otherwise.  As a starting point, it is evident that the wiretap was not the initial step in the investigation.  The Fry Affidavit established that starting in February 2010, officers utilized CS#1 who identified Avila, as a multi-pound source of methamphetamine in St Paul, was able to obtain Avila's cellular telephone number, and conducted controlled buys of methamphetamine from Avila under the surveillance of officers.  Officers also had CS#1 place recorded calls to Avila in order to purchase methamphetamine.   Officers used pen registers, which assisted the officers in determining which telephone number Avila was using, and connected Avila with other known narcotics users and traffickers.  Further, officers also utilized an existing wiretap

28

in order to intercept a conversation between Busto-Magaran and Avila regarding suspected narcotics activity.  At the same time, the Fry Affidavit set forth in explicit detail the limitations of obtaining further information through these mechanisms and other techniques such as search warrants, confidential sources of information, use of undercover officers, trash searches and grand jury subpoenas.  Additionally, Fry explained why these various procedures could not achieve the overall objectives of the investigation, including determination of the scope, extent and personnel involved in the narcotics trafficking conspiracy, identification of the suppliers and customers of the organization, and establishing the management and disposition of proceeds generated by this organization.

In short, the Court finds Mendoza-Cabrera's suggestion that the Fry Affidavit failed to set forth sufficient facts to establish that undercover investigations, surveillance, search warrants or grand jury subpoenas to further the investigation were too dangerous or were unlikely to be effective, to be without merit.  Although "many of the reasons given in the affidavit for the ineffectiveness of traditional investigative techniques are common to most drug conspiracy investigations, this fact does not necessarily preclude a finding of necessity under section 2518(1)(c)."  Thompson, 210 F.3d at 859.  Deputy Fry stated that the execution of search warrants or the issuance of grand jury subpoenas would serve to alert the subject of the investigation. Given that officers were investigating a drug-trafficking operation in conjunction with a conspiracy to distribute methamphetamine, it was not unreasonable for officers to want to use these techniques as methods of last resort, so as not to alert the alleged participants of the conspiracy of the investigation and to avoid having participants plead the Fifth Amendment.  Deputy Fry also indicated that the use of search warrants was of

limited utility when investigating a large-scale drug operation, particularly where the amount of narcotics is large, participants use multiple locations for the storage of drugs and proceeds, and there is a finite period between delivery of drugs, distribution and collecting proceeds,

As for the use of undercover investigations, Deputy Fry explained that the only direct connection officers had to Avila was CS#1, who acted as a customer to Avila. Even if CS#1 had introduced an undercover officer to Avilla, Deputy Fry established that it was unlikely that the officer could have served as anything more than a customer to the organization.

Regarding surveillance, Deputy Fry discussed the fruits of their surveillance, including the surveillance of Avila as it related to narcotics transactions with CS#1 and his use of cellular telephones. Notwithstanding these successes in surveillance, Deputy Fry indicated that based on his training and experience, surveillance, alone, rarely is successful in gathering conclusive evidence of the scope of the criminal activities involved, is usually used to confirm meetings between co-conspirators or to identify people and locations, and cannot be used effectively where many of the individuals that contact the target phone are unknown by law enforcement.

Considering all of these facts and the explanations provided by Deputy Fry, this Court concludes that the Government met its statutory obligation under 18 U.S.C. § 2518(1) by providing the requisite statement of necessity for the wiretap on TT-2 (651), and therefore, Mendoza-Cabrera's motion to suppress should be denied.

### **RECOMMENDATION**

For the reasons set forth above and based on all the files, records, and proceedings herein,

**IT IS RECOMMENDED THAT:**

1.      Defendant Luis A. Mendoza-Cabrera's Motion to Suppress Evidence as a Result of Electronic Surveillance [Docket No. 110] be **DENIED**;

2.      Defendant Rigoberto Busto-Magaran's Pretrial Motion to Dismiss Count 1 [Docket No. 135] be **DENIED WITHOUT PREJUDICE**; and

3.      Defendant Jose Hernandez-Bustos's Motion to Suppress Contents of Intercepted Wire and Oral Communications [Docket No. 193] be **DENIED**.


Dated:  May 27, 2011

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge


**NOTICE**

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 10, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **June 10, 2011**.